No. 20-10242

IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA
Plaintiff-Appellee

v.

JACOB LYMAN
Defendant-Appellant

Appeal from the United States District Court for the District of Hawaii
United States District Judge Derrick K. Watson
District Court No. 1:12-cr-01256-DKW-1

**DEFENDANT-APPELLANT'S OPENING BRIEF**

Peter C. Wolff, Jr.
Federal Public Defender, District of Hawaii

Max J. Mizono
Assistant Federal Defender
300 Ala Moana Boulevard, Suite 7104
Honolulu, Hawaii 96850
Telephone (808) 541-2521
Facsimile (808) 541-3545
E-Mail max_mizono@fd.org

Counsel for Jacob Lyman

# Contents

Jurisdiction ........................................................... 1

Bail Status ........................................................... 1

Issues ................................................................. 1

Pertinent Legal Provisions ............................................ 2

Case Statement ........................................................ 6

Argument Summary ...................................................... 13

Argument .............................................................. 15

      1. Standards of Review .......................................... 15

      2. *Stinson* deference .......................................... 16

      3. Physical and medical condition ............................... 31

      4. Relevance of the post-FSA mandatory minimum .................. 41

Conclusion ............................................................ 45

Statement of Related Cases

Form 8 Certificate of Compliance

## Table of Authorities

**Cases**

*Lewis v. Liberty Mut. Ins. Co.*, 953 F.3d 1160 (CA9 2020) ........................... 41

*Stinson v. United States*, 508 U.S. 36 (1993) ....................................... 9, passim

*Torres v. Milusnic*, DC No. 2:20-cv-04450-CBM-PVC (C.D. Cal.) ........ 38, 40

*United States v. Aruda*, ___ F.Supp.3d ___,
    2020 WL 4043496 (D. Haw.) (2020) ................................... 11

*United States v. Baclaan*,
    2020 WL 2820199 (D. Haw.) (May 29, 2020) (slip copy) .................. 11

*States v. Ben-Yhwh*, 435 F.Supp.3d 1324 (D. Haw. 2020) ............................ 11

*United States v. Bryant*,
    2020 WL 2085471 (D. Md.) (Apr. 30, 2020) (slip copy) .................... 43

*United States v. Caminos*, ___ F.Supp.3d ___,
    2020 WL 4199704 (D. Haw. 2020) (JMS) ........................................ 11

*United States v. Cantu-Rivera*, 2019 WL 2578272
    (S.D. Tex.) (June 24, 2019) (unpublished) ......................................... 43

*United States v. Cavera*, 550 F.3d 180 (CA2 2008) (en banc) ...................... 43

*United States v. Chan*,
    2020 WL 1527895 (N.D. Cal.) (Mar. 31, 2020) (slip copy) ............... 43

*United States v. Cisneros*,
    2020 WL 3065103 (D. Haw. (SOM)) (June 9, 2020)
    (slip copy) ................................................................. 10, 29, 43

*United States v. Contreras*, 2020 WL 3642247
    (D. Haw. (DKW)) (July 6, 2020) (slip copy) .................................... 11

*United States v. Cuevas-Lopez*, 934 F.3d 1056 (CA9 2019) ......................... 16

*United States v. Galu*, 2020 WL 5521034
    (D. Haw. (SOM)) (Sept. 14, 2020) (slip copy) ................................. 11

*United States v. Garcia*, 2020 WL 3547933
    (D. Haw. (HG)) (June 30, 2020) (slip copy) ..................................... 11

*United States v. Hernandez*, 2020 WL 3453839
    (D. Haw. (JMS)) (June 24, 2020) (slip copy) ............................... 11, 30

*United States v. Hernandez*, 2020 WL 5521035
    (D. Haw. (SOM)) (Sept. 14, 2020) (slip copy) ................................. 11

*United States v. Iwai*, 2020 WL 3258405
    (D. Haw. (DKW)) (June 15, 2020) (slip copy) ................................. 12

*United States v. Kamaka*, 2020 WL 2820139
    (D. Haw. (SOM)) (May 29, 2020) (slip copy) .................................. 11

*United States v. Kapeli*,
    DC No. 1:16-cr-00172-JMS (D. Haw.) (Sept. 18, 2020) ................... 39

ii

*United States v. Kazanowski*, 2020 WL 3578310
    (D. Haw. (DKW)) (July 1, 2020) (slip copy) ...................................... 11

*United States v. Kealoha*, 2020 WL 3735773
    (D. Haw. (DKW)) (July 6, 2020) (slip copy) ............................ 9, 11, 29

*United States v. Khoury*, 62 F.3d 1138 (CA9 1995) ...................................... 31

*United States v. Lillard*, 354 F.3d 850 (CA9 2003) ...................................... 16

*United States v. Lum*, 2020 WL 3472908
    (D. Haw. (DKW)) (June 25, 2020) (slip copy) .................................... 11

*United States v. Lyman*, 2020 WL 4318754
    (D. Haw. (DKW)) (July 27, 2020) (slip copy) .................................... 11

*United States v. Malufau*, ___ F.Supp.3d ___,
    2020 WL 4218038 (D. Haw. 2020) (LEK) .................................... 11

*United States v. Maumau*, 2020 WL 806121
    (D. Utah) (Feb. 18, 2020) (slip copy) .................................... 44

*United States v. McEnry*, 659 F.3d 893 (CA9 2011) .................................... 15

*United States v. Mondaca*, 2020 WL 1029024
    (S.D. Cal.) (Mar. 3, 2020) (slip copy) .................................... 43

*United States v. Morales*, 972 F.2d 1007 (CA9 1992) .................................... 31

*United States v. Paul*, 561 F.3d 970 (CA9 2009) .................................... 45

*United States v. Perez*, 962 F.3d 420 (CA9 2020) .................................... 16

*United States v. Quinn*, ___ F.Supp.3d ___,
    2020 WL 3275736 (N.D. Cal. 2020) .................................... 43

*United States v. Quintero*, 2020 WL 3639936
    (N.D. Cal.) (July 6, 2020) (slip copy) .................................... 43

*United States v. Rodrigues*, 2020 WL 5351029
    (D. Haw. (DKW)) (Sept. 4, 2020) (slip copy) ............................ 11, 29

*United States v. Schweder*, 2020 WL 5257598
    (E.D. Cal.) (Sept. 3, 2020) (slip copy) .................................... 30

*United States v. Seals*, 2020 WL 3578289
    (D. Haw. (SOM)) (July 1, 2020) (slip copy) ...................................... 11

*United States v. Tufele*, 2020 WL 5223775
    (D. Haw. (DKW)) (Sept. 1, 2020) (slip copy) .................................... 11

*United States v. Wallace*, No. 1:16-cr-00744-DKW-9 (D. Haw.) ................ 10

*United States v. Washington*, 971 F.3d 856 (CA9 2020) ............................... 15

*United States v. Wei Lin*, 841 F.3d 823 (CA9 2016) .................................... 15

*United States v. Wong*, 2020 WL 3415870
    (D. Haw. (DKW)) (June 22, 2020) (slip copy) .................................... 12

*United States v. Yellin*, 2020 WL 3488738
    (S.D. Cal.) (June 26, 2020) (slip copy) .................................... 36

*United States v. Zullo*, ___ F.3d. ___,
    2020 WL 5739712 (CA2 2020) ................................................ 24, passim
*United States v. Zuniga*, 66 F.3d 225 (CA9 1995) ........................................ 16

**Constitutional Provision**
U.S. Const., amend. VIII ................................................................. 2

**Statutes**
18 U.S.C. §3142 ............................................................................. 3, 4
18 U.S.C. §3231 ............................................................................. 1
18 U.S.C. §3553 ............................................................................. 2, passim
18 U.S.C. §3559 ............................................................................. 2–4
18 U.S.C. §3582 ............................................................................. 2–4
21 U.S.C. §841 ....................................................................... 7, 14, 41, 42
21 U.S.C. §851 ............................................................................. 6, 7
28 U.S.C. §994 ............................................................................. 43
28 U.S.C. §1291 ............................................................................. 1

**Guideline**
USSG §1B1.13 ............................................................................. 1, passim

**Other Authority**
BOP Coronavirus web page, https://www.bop.gov/coronavirus ................... 32
*Clinical Questions about Covid-19: Questions and Answers*:
    *Transmission: Can people who recover from Covid-19 be*
    *re-infected with SARS-CoV-2*, CDC (Aug. 4, 2020),
    www.cdc.gov/coronavirus/2019-ncov/hcp/
    faq.html#Transmission ....................................................... 35
*Covid-19 Hospitalization and Death by Age*, CDC (Aug. 18, 2020),
    www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-
    discovery/hospitalization-death-by-age.html ....................................... 34
Haseltine, William A., *What Covid-19 Reinfection Means for Vaccines*,
    Scientific American (Sept. 23, 2020),
    www.scientificamerican.com/article/
    what-covid-19-reinfection-means-for-vaccines/ .................................. 35
*How to Protect Yourself & Others*, CDC (Sept. 11, 2020),
    www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.
    html ....................................................................................... 33

Human Rights Watch & Families Against Mandatory Minimums,
*The Answer Is No: Too Little Compassionate Release in
US Federal Prisons* (Nov. 2012), available at
www.hrw.org/sites/default/files/reports/us1112ForUploadSm.pdf ...... 20

*Inmate Death at FCI Butner (Low)*, BOP Press Release (Sept. 17, 2020),
www.bop.gov/resources/news/pdfs/20200917
_press_release_bux.pdf ......................................................................... 37

*Inmate Death at FCI Edgefield*, BOP Press Release (Sept. 25, 2020),
www.bop.gov/resources/news/
pdfs/220200926_press_release_johnson.pdf ....................................... 37

*Inmate Death at FMC Carswell*, BOP Press Release (Aug. 26, 2020),
www.bop.gov/resources/news/pdfs/
20200826_press_release_crw.pdf ........................................................ 37

*Inmate Death at FMC Lexington*, BOP Press Release (July 31, 2020),
www.bop.gov/resources/
news/pdfs/20200731_press_release_lex.pdf ........................................ 38

*Inmate Death at FMC Lexington*, BOP Press Release (Sept. 25. 2020),
www.bop.gov/resources/news/pdfs/20200925_press_release_lex.pdf 37

*Inmate Death at Lompoc FCI*, BOP Press Release (May 29, 2020),
www.bop.gov/resources/news/pdfs/20200529_press
_release_lox.pdf ................................................................................... 40

*Inmate Death at Lompoc FCI*, BOP Press Release (June 1, 2020),
www.bop.gov/resources/news/pdfs/20200601_press_release
_lom.pdf ................................................................................................ 40

*Inmate Death at the FCI Terminal Island*, BOP Press Release (May 27, 2020),
www.bop.gov/resources/news/pdfs/
20200527_press_release_trm.pdf ........................................................ 36

Lapid, Nancy, *Covid-19 reinfection detected in U.S. patient;
saliva tests endorsed*, Reuters (Aug. 28, 2020), www.reuters.com/
article/us-health-coronavirus-science-
idUSKBN25O2UP?taid=5f497d444b
992e000118c1b1&utm_campaign=trueAnthem:+Trending+Content&utm
_medium=trueAnthem&utm_source=twitter ....................................... 36

Ledford, Heidi, *Coronavirus reinfections: three questions scientists
are asking*, Nature (Sept. 4, 2020), www.nature.com/articles/d41586-
020-02506-y ........................................................................................ 35

Minsky, Dave, *Nearly all inmates at Lompoc FCI tested positive for coronavirus, most asymptomatic*, Lompoc Record (June 5, 2020), www.lompocrecord.com/news/local/crime-and-courts/nearly-all-inmates-at-lompoc-fci-tested-positive-for-coronavirus-most-asymptomatic/article_f3fb06d7-f231-52b3-8f89-f21f11b73974.html . 40

*People with Certain Medical Conditions*, CDC (Sept. 11, 2020), www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html ............................................................... 33

S. Rep. No. 98-225 (1984) ........................................................................ 44

Thomas, Liji, MD, *Does cholesterol play a role in Covid-19?*, News Medical Life Sciences (May 12, 2020), www.news-medical.net/news/20200512/Does-cholesterol-play-a-role-in-COVID-19.aspx ........................................................................................................ 33

*Updated Isolation Guidance does not Imply Immunity to Covid-19*, CDC (Aug. 14, 2020), www.cdc.gov/media/releases/2020/s0814-updated-isolation-guidance.html .............. 35

WebMD, *Coronavirus Immunity and Reinfection*, www.webmd.com/lung/coronavirus-immunity-reinfection#1 ............. 36

**Jurisdiction**

This appeal arises from the district court's order denying defendant-appellant Jacob Lyman's compassionate release motion under 18 U.S.C. §3582(c)(1)(A). The district court filed that order on July 27, 2020. Defendant-Appellant's Excerpts of Record (ER) at ER-1–ER-6. Lyman filed notice of appeal on July 28, 2020. ER-7–ER-8. The district court had jurisdiction under 18 U.S.C. §3231 and §3582. This Court has jurisdiction under 28 U.S.C. §1291.

**Bail Status**

Lyman is incarcerated at Lompoc FCI with a projected release of December 14, 2029.

**Issues**

1.      Did the district court wrongly defer to USSG §1B1.13 to limit its discretion to grant a defendant's 'compassionate release' motion under §3582(c)(1)(A)?

2.      Did the district court erroneously determine Lyman's physical and medical condition, which increased his risk of hospitalization and death from Covid-19, did not substantially diminish his ability to care for himself in Lompoc FCI or otherwise constitute an extraordinary and compelling reason to reduce his sentence under §3582(c)(1)(A)?

1

3.    Did the district court wrongly conclude a change in sentencing law—here, the First Step Act's lowering of the statutory mandatory minimum applicable to Lyman's offense conduct and criminal history—was irrelevant in a §3582(c)(1)(A) compassionate release proceeding?

## Pertinent Legal Provisions

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., amend. VIII.

The court may not modify a term of imprisonment once it has been imposed except that—

(1)   in any case—

(A)   the court, upon motion of the Director of the Bureau of Prisons, *or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, which is earlier,* may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i)   extraordinary and compelling reasons warrant such a reduction; or

(ii)   the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned,

2

> and a determination has been made by the Director of the
> Bureau of Prisons that the defendant is not a danger to
> the safety of any other person or the community, as
> provided under section 3142(g);

and that such a reduction is consistent with applicable policy
statements issued by the Sentencing Commission[.]

18 U.S.C. §3582(c) (eff. 12/21/18) (First Step Act of 2018, Pub. L. No. 115-

391, §603, 132 Stat. 5194, 5239, amendment emphasized).

The court may not modify a term of imprisonment once it has been
imposed except that—

(1)   in any case—

(A)   the court, upon motion of the Director of the Bureau of
Prisons, may reduce the term of imprisonment (and may
impose a term of probation or supervised release with or
without conditions that does not exceed the unserved portion
of the original term of imprisonment), after considering the
factors set forth in section 3553(a) to the extent that they are
applicable, if it finds that—

(i)   extraordinary and compelling reasons warrant such a
reduction; or

(ii)   the defendant is at least 70 years of age, has served
at least 30 years in prison, pursuant to a sentence
imposed under section 3559(c), for the offense or
offenses for which the defendant is currently imprisoned,
and a determination has been made by the Director of the
Bureau of Prisons that the defendant is not a danger to
the safety of any other person or the community, as
provided under section 3142(g);

and that such a reduction is consistent with applicable policy
statements issued by the Sentencing Commission[.]

18 U.S.C. §3582(c) (eff. 11/02/02 to 12/20/18).

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. §3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. §3553(a), to the extent that they are applicable, the court determines that—
>
> > (1)   (A)   extraordinary and compelling reasons warrant the reduction; or
> >
> > (B)   the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. §3559(c) for the offense or offenses for which the defendant is imprisoned;
> >
> > (2)   the defendant is not a danger to the safety of any other person or the community, as provided in 18 U.S.C. §3142(g); and
> >
> > (3)   the reduction is consistent with this policy statement.

USSG § 1B1.13 (eff. 11/01/18).

> 1.   <u>Extraordinary and Compelling Reasons</u>.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> > (A)   <u>Medical Condition of the Defendant</u>—
> >
> > (i)   The defendant is suffering from a terminal illness (<u>i.e.</u>, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (<u>i.e.</u>, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer,

amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii)   The defendant is—

(I)   suffering from a serious physical or medical condition,

(II)   suffering from a serious functional or cognitive impairment, or

(III)   experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)   Family Circumstances.

(i)   The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii)   The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)   Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

USSG §1B1.13, comment. (n.1) (eff. 11/01/18).

> 4. <u>Motion by the Director of the Bureau of Prisons.</u>—A reduction under this policy statement may be granted only upon motion by the Director of the Bureau of Prisons pursuant to 18 U.S.C. §3582(c)(1)(A). The Commission encourages the Director of the Bureau of Prisons to file such a motion if the defendant meets any of the circumstances set forth in Application Note 1. The court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction), after considering the factors set forth in 18 U.S.C. §3553(a) and the criteria set forth in this policy statement, such as the defendant's medical condition, the defendant's family circumstances, and whether the defendant is a danger to the safety of any other person or the community.

USSG §1B1.13, comment. (n. 4) (eff. 11/01/18).

> 5. <u>Application of Subdivision (3).</u>—Any reduction made pursuant to a motion by the Director of the Bureau of Prisons for the reasons set forth in subdivisions (1) and (2) is consistent with this policy statement.

USSG §1B1.13, comment. (n. 5) (eff. 11/01/18).

## Case Statement

In 2015, the district court sentenced Lyman to 20 years of imprisonment and 10 years of supervised release on a drug offense. ER-10–ER-12. The government filed an §851 notice, which weaponized Lyman's prior drug conviction[1] to trigger a 20-year (statutory mandatory minimum) imprisonment

---

[1]     Lyman has two prior convictions. Presentence Report (PSR) at ¶¶34–43. His prior 2003 drug conviction was the only one that resulted in criminal

term. PSR at ¶¶58–59; 21 U.S.C. §§841 (prior to FSA amendment) and 851.

Lyman's guideline range, had not the government filed a §851 notice, would

have been 135–168 months—on an offense level of 31 (set solely by drug

amount, as no other enhancements applied to him) and a criminal history

category of III. PSR at ¶¶23–33, 60.

In 2018, the First Step Act lowered the statutory mandatory minimum,

from 20 years down to 15, that an §851 notice rendered applicable to a one-time

drug recidivist. First Step Act of 2018 (FSA), Pub. L. No. 115-391, §401(a),

132 Stat. 5194, 5220. The FSA, however, pinned the retroactivity line for that

change to when sentencing occurred, allowing those not yet sentenced when the

FSA went into effect on December 21, 2018, to receive the benefit of the lower

mandatory minimum, but not those sentenced beforehand. FSA, Pub. L. No.

115-391, §401(c), 132 Stat. at 5221.

On July 2, 2020, Lyman filed a compassionate release motion, in which

he sought a sentence reduction under §3582(c)(1)(A). ER-1; ER-37. Lyman's

---

history points. PSR at ¶¶36–38. His third-degree assault conviction from 1999,
committed when he was 19, was dismissed in 2001, after Lyman successfully
completed a deferral period. PSR at ¶36. The assault consisted of a group of
young men accosting two male tourists after some verbal sparring at three in the
morning; the group of men fled, but Lyman returned to the scene, admitted
taking part in the altercation, and submitted to arrest. PSR at ¶36.

motion explained that he was severely obese (with a BMI that ranged from 40–44.9 during his time of BOP incarceration) and that he had chronic kidney disease, as well as asthma, hyperglycemia (high blood sugar and a diabetic indicator), hyperlipidemia (high cholesterol), gout, and a degenerative disc disorder, among other ailments. DC ECF 59-1 at 7–8; DC ECF 63. Lyman's motion summarized Lompoc FCI's inability to prevent inmates and staff from becoming infected with, and dying from, Covid-19. DC ECF 59-1 at 5–6. And though Lyman was among those who had become infected and recovered, his motion emphasized that, as of early July (when the motion was filed), the immune response to Covid-19 was not understood. DC ECF 59-1 at 6–7. Lyman also urged the district court to consider the FSA's reduction of the statutory mandatory minimum and the fact that he had served more than half of the reduced minimum. DC ECF 65 at 3–9. The government did not oppose Lyman's motion. ER-2; ER-37–ER-38. The district court nonetheless denied it. ER-1–ER-6.

Citing both §3582(c)(1)(A) and USSG §1B1.13's policy statement and commentary, the district court asserted it could grant the motion, "after considering" the sentencing factors set forth in 18 U.S.C. §3553(a), only "if … extraordinary and compelling reasons warrant such a [sentence] reduction, [Lyman] is not a danger to the safety of others or the community, and the

reduction is consistent with" §1B1.13. ER-2–ER-3. The district court deferred to one of the guideline's application notes for the content of what constituted an extraordinary and compelling reason to grant compassionate release. ER-3. Pertinent here, the district court stressed that the application note required a showing of "a serious physical or medical condition," from which Lyman was "not expected to recover," and which "substantially diminish[ed]" Lyman's "ability … to provide self-care within" Lompoc FCI, or a showing of some "other" reason, but only as "determined by the Director of the Bureau of Prisons," that either sufficed on its own or worked with the application note's enumerated circumstances to generate an extraordinary and compelling reason to reduce Lyman's sentence. ER-3.

The district court's recitation in this matter of the governing legal standard is a truncated summation of what it had previously articulated at greater length in other pandemic-related compassionate release cases, most notably in *United States v. Kealoha*, 2020 WL 3735773 (D. Haw. (DKW)) (July 6, 2020) (slip copy). District Court Judge Watson has ruled that the pre-FSA version of USSG §1B1.13 remains a binding interpretation of the post-FSA §3582(c)(1)(A) to which he must defer under *Stinson v. United States*, 508 U.S. 36 (1993). *Kealoha*, 2020 WL 3735573, at *5–*6. Judge Watson accordingly declines any invitation to make an independent judicial determination of

9

whether the circumstances of a particular case are extraordinary and compelling

under §3582(c)(1)(A) and §1B1.13(1)(A) outside the narrow ambit that

Application Note 1 of the guideline circumscribes.[2] *Id.*

Largely driven by that notion, Judge Watson has yet to grant any

defendant §3582(c)(1)(A) relief during the Covid-19 pandemic.[3] *United States*

---

[2]     Judge Watson isn't just misreading the guideline, he also misreads the statute. In another compassionate release case, Judge Watson recently ruled that the court would hold a defendant's motion in abeyance pursuant to the statute's 'exhaustion' requirement until the defendant completed the BOP's administrative appellate process or she waived her right to further appeal her warden's denial of her administrative compassionate release request. *United States v. Wallace*, No. 1:16-cr-00744-DKW-9, ECF 788 (09/30/2020). Section 3582(c)(1)(A), however, allows for judicial review of a defendant's compassionate release motion after either the defendant exhausts administrative review "or" 30 days lapse from the time the warden received the defendant's administrative release request, "whichever is earlier." 18 U.S.C. §3582(c)(1)(A). In the *Wallace* case, there is no doubt that 30 days lapsed from the warden's receipt of Wallace's administrative compassionate release request, given that the warden denied it on July 31, 2020. *Wallace*, ECF 783 at 2 n. 1 (09/25/2020); *id.*, ECF 783-1 (09/25/2020). The district court's abeyance order thus dispensed with the statute's unambiguous mandate to apply the earlier of the two avenues that allow for judicial review of Wallace's motion. Thirty days having elapsed from July 31, 2020, the statute's administrative appeal exhaustion alternative plainly had no role left to play in her case at the time the court issued its abeyance ruling.

[3]     There is an intra-district split—and intra-circuit and national inter-district splits—on whether, and how much, deference the guideline commands under the post-FSA version of the statute. See *United States v. Cisneros*, 2020 WL 3065103, at *2 (D. Haw. (SOM)) (June 9, 2020) (slip copy) ("[t]his court recognizes that it possesses considerable discretion in determining whether a particular defendant has established the existence of extraordinary and

*v. Rodrigues*, 2020 WL 5351029 (D. Haw. (DKW)) (Sept. 4, 2020) (slip copy)

(denying); *United States v. Tufele*, 2020 WL 5223775 (D. Haw. (DKW)) (Sept.

1, 2020) (slip copy) (denying) (appeal docketed CA9 20-10282); *United States*

*v. Lyman*, 2020 WL 4318754 (D. Haw. (DKW)) (July 27, 2020) (slip copy)

(denying) (also ER-1–ER-6); *United States v. Aruda*, ___ F.Supp.3d ___, 2020

WL 4043496 (D. Haw. 2020) (DKW) (denying) (appeal docketed CA9 20-

10245); *Kealoha* (denying); *United States v. Contreras*, 2020 WL 3642247 (D.

Haw. (DKW)) (July 6, 2020) (slip copy) (denying); *United States v.*

*Kazanowski*, 2020 WL 3578310 (D. Haw. (DKW)) (July 1, 2020) (slip copy)

(denying); *United States v. Lum*, 2020 WL 3472908 (D. Haw. (DKW)) (June

--------------------------------

compelling reasons that justify early release" (collecting SOM cases so ruling));
*United States v. Hernandez*, 2020 WL 3453839, at *2–*4 (D. Haw. (JMS))
(June 24, 2020) (slip copy) (same; collecting cases on both sides of the split).
Judge Watson is also an outlier in not having granted compassionate release
during the pandemic. Compare the DKW cases string cited above with, e.g.,
*United States v. Garcia*, 2020 WL 3547933 (D. Haw. (HG)) (June 30, 2020)
(slip copy) (granting); *United States v. Baclaan*, 2020 WL 2820199 (D. Haw.
(HG)) (May 29, 2020) (slip copy) (granting); *United States v. Malufau*, ___
F.Supp.3d ___, 2020 WL 4218038 (D. Haw. 2020) (LEK) (granting); *United
States v. Ben-Yhwh*, 453 F.Supp.3d 1324 (D. Haw. 2020) (LEK) (granting);
*United States v. Hernandez*, 2020 WL 5521035 (D. Haw. (SOM)) (Sept. 14,
2020) (slip copy) (granting); *United States v. Galu*, 2020 WL 5521034 (D.
Haw. (SOM)) (Sept. 14, 2020) (slip copy) (granting); *United States v. Seals*,
2020 WL 3578289 (D. Haw. (SOM)) (July 1, 2020) (slip copy) (granting);
*United States v. Kamaka*, 2020 WL 2820139 (D. Haw. (SOM)) (May 29, 2020)
(slip copy) (granting); *United States v. Caminos*, ___ F.Supp.3d ___, 2020 WL
4199704 (D. Haw. 2020) (JMS) (granting).

11

25, 2020) (slip copy) (denying); *United States v. Wong*, 2020 WL 3415870 (D. Haw. (DKW)) (June 22, 2020) (slip copy) (denying); *United States v. Iwai*, 2020 WL 3258405 (D. Haw. (DKW)) (June 15, 2020) (slip copy) (denying).

In Lyman's case, the district court ruled that there was no extraordinary and compelling reason to grant compassionate release. ER-4–ER-6. The district court reasoned that Lyman's medical condition, which the CDC recognized put him at high risk for hospitalization and death from Covid-19, had not "substantially diminished his ability to provide self-care in prison" because he had recovered from infection once. ER-4–ER-5. The district court also noted— but did not really explain why it was noting (other than to drop a footnote saying that the application note's "other reasons" criterion was of "no use to Lyman," presumably because the BOP hadn't determined there were any)—that Lompoc FCI had no cases of infection on July 24, 2020, three days before the court filed its written order. ER-5. The district court also rejected Lyman's reliance on the lower FSA statutory minimum, because the application note's criteria all related "to health" and the lower mandatory minimum didn't relate to health, and because the FSA didn't make the change retroactive. ER-5–ER-6.

The district court did not reach consideration of §3553(a)'s factors. ER-4–ER-6. Nor did the district court make any determination about dangerousness. ER-4–ER-6.

## Argument Summary

Reversal and remand are required here because the district court misunderstood the scope of its discretion to grant a defendant's 'compassionate release' motion for a sentence reduction under 18 U.S.C. §3582(c)(1)(A). The prior version of §3582(c)(1)(A) only allowed the Director of the Bureau of Prisons to move for a 'compassionate release' sentencing reduction. The guideline policy statement and its commentary (USSG §1B1.13) promulgated under that older version of the statute state, naturally enough, that the guideline and commentary apply only to BOP motions. Congress amended the statute in 2018 to allow for defendants to move for a 'compassionate release' sentencing reduction too, so the current version of the statute allows for motions by either the BOP or the defendant. The Sentencing Commission, however, has not amended §1B1.13 and, thus, it still states that it only applies "[u]pon motion of the Director of the Bureau of Prisons," a limitation its commentary reiterates. Nor has the Sentencing Commission adopted a new guideline policy statement that applies "upon motion of the defendant." Even though §1B1.13 states it doesn't apply to Lyman's motion, the district court nonetheless deferred to and applied the guideline policy statement and its commentary to restrict the court's discretion to decide whether Lyman's case presented extraordinary and compelling reasons to reduce Lyman's sentence.

13

The district court also restricted its discretion in another way, by categorically determining that the FSA's reduction of 21 U.S.C. §841's mandatory minimums was entirely irrelevant under §3582(c)(1)(A), because the mandatory minimum reduction did not retroactively apply to Lyman and did not relate to the health concerns that animated the guideline's commentary. Section 3582(c)(1)(A), however, directs courts to consider 18 U.S.C. §3553(a)'s sentencing factors. The fact that Congress reduced the mandatory minimum applicable to Lyman's offense conduct and criminal history speaks to several of §3553(a)'s factors, even if it does not speak directly to Lyman's health.

Reversal and remand are also required here for another reason, because the district court erred in assessing whether Lyman's physical and medical condition was extraordinary and compelling under §3582(c)(1)(A) and, even if applicable, USSG §1B1.13. The district court winnowed Lyman's physical and medical condition through Application Note 1(A)(ii) and concluded that his condition did not count as extraordinary and compelling because it did not substantially diminish his ability to provide self-care within Lompoc FCI. But the district court quarantined the commentary's self-care standard from the world-wide Covid-19 pandemic and, thus, appears to have set the baseline of self-care at being able to complete ordinary daily tasks independently (such as

14

eating and bathing), without including the ability to self-guard against infection, hospitalization, and death from Covid-19.

The district court's determination on this point rested, moreover, on its view that Lyman's prior infection and recovery from Covid-19, and the fact that Lompoc FCI did not have any current cases of inmate infection on a particular day (July 24, 2020, three days before the court issued its order denying Lyman's motion), demonstrated that he wasn't at that much risk from Covid-19. Recovery, however, is no indication of immunity, a point not only recently conceded by the BOP, but which the BOP's own documentation of reinfection deaths grimly establishes. Nor does a frozen day in time evince much of anything about whether the BOP is able to prevent Covid-19 from again running rampant in Lompoc FCI.

## Argument

### 1.    Standards of Review

This Court reviews questions of law—such as whether a guideline is an "applicable policy statement" to which §3582(c)(1)(A) refers, whether a guideline triggers *Stinson* deference, and whether something is relevant—de novo. *United States v. Washington*, 971 F.3d 856, 861 (CA9 2020) (statutory interpretation); *United States v. Wei Lin*, 841 F.3d 823, 825 (CA9 2016) (guideline interpretation); *United States v. McEnry*, 659 F.3d 893, 897 (CA9

2011) (which guideline applies); *United States v. Zuniga*, 66 F.3d 225, 227

(CA9 1995) (whether guideline applies); *United States v. Lillard*, 354 F.3d 850,

853 (CA9 2003) (relevancy). The district court's application of governing

law—such as the right guideline or a correct interpretation of a controlling

statute—is reviewed for an abuse of discretion. *United States v. Perez*, 962 F.3d

420, 447 (CA9 2020).

### 2. *Stinson* deference

*Stinson* deference applies to guideline policy statements and

commentary. *Stinson v. United States*, 508 U.S. 36, 38 (1993); *United States v.

Cuevas-Lopez*, 934 F.3d 1056, 1061 (CA9 2019). A district court, accordingly,

should generally defer to a guideline's commentary (its application notes), so

long as the commentary doesn't violate the Constitution or a statute and isn't

inconsistent with, or a plainly erroneous interpretation or explanation of, its

guideline. *Stinson*, 508 U.S. at 38; *Cuevas-Lopez*, 934 F.3d at 1061. By the

same token, deference is also due to a guideline policy statement, but again,

only so long as the policy statement doesn't violate the Constitution or a statute

and isn't inconsistent with, or a plainly erroneous interpretation or explanation

of, the particular statute that the policy statement interprets, explains, or

implements. *Stinson*, 508 U.S. at 38; *Cuevas-Lopez*, 934 F.3d at 1061.

Before the First Step Act went into effect on December 21, 2018, section 3582(c)(1)(A) allowed for a court to grant the BOP's motion, and only a BOP motion, to reduce a prisoner's sentence on two grounds. Either because extraordinary and compelling reasons warranted reducing the defendant's sentence. 18 U.S.C. §3582(c)(1)(A)(i) (2002). Or because the defendant had lived past 70 and served at least 30 years' imprisonment, and the BOP had determined (under the standards set by the Bail Reform Act) that the defendant wasn't a danger to anyone or the community. 18 U.S.C. §3582(c)(1)(A)(ii) (2002). The statute directed the court to consider the general sentencing factors set forth in 18 U.S.C. §3553(a), to the extent any applied. 18 U.S.C. §3582(c)(1)(A) (2002). And the statute required reduction to be consistent with any applicable guideline policy statement. 18 U.S.C. §3582(c)(1)(A) (2002). The sentencing reduction that §3582(c)(1)(A) authorizes is often referred to as 'compassionate release,' and the statute allowed for compassionate release only if the BOP moved for it on the defendant's behalf.

The guideline policy statement that was applicable to compassionate release under the pre-FSA version of §3582(c)(1)(A) was USSG §1B1.13, last promulgated on November 1, 2018, a month before the FSA went into effect. Section 1B1.13 leads with the limitation that it applies only "[u]pon motion of the Director of the Bureau of Prisons under 18 U.S.C. §3582(c)(1)(A)" and, like

17

the statute, requires consideration of any applicable §3553(a) factors. Subsection (1)(A) of the policy statement mimics the statute's extraordinary and compelling reasons criterion. Subsection (1)(B) of the policy statement repeats the statute's alternative age and service criterion, but not the statute's lack-of-danger requirement. Subsection (2) makes lack of danger a requirement in all cases (the statute limited it to only the age and service criterion) and makes the court the decision-maker on lack of danger (the statute had the BOP determining lack of danger). And meta subsection (3) requires reduction to be consistent with "this policy statement."

Three of §1B1.13's application notes are pertinent, two of which are more quickly glossed than the third. Ensuring the consistency requirement requires consistency, Application Note 5 states that the consistency requirement is met when the BOP's motion invokes the grounds set forth in subsections (1) or (2) of the policy statement. Application Note 4 limits the district court's discretion to grant compassionate release "only upon motion by" the BOP. But, at the same time, Application Note 4 also encourages the BOP to file the motion in any case involving extraordinary and compelling reasons and recognizes that the court is in "a unique position" to determine whether to grant the motion, after holistic consideration of the circumstances that §3582(c)(1)(A), §3553(a), and the policy statement and its commentary direct the court to consider.

18

Application Note 1's delineation of what counts as "extraordinary and compelling reasons" to grant compassionate release takes a tad longer to unpack.

Application Note 1 starts by emphasizing that subsection (2)'s lack-of-danger requirement must be met in extraordinary and compelling reasons (ECR) cases just as much as it must in age and service (A&S) cases. Application Note 1 then defines four "circumstances" that count as extraordinary and compelling: (A) medical condition; (B) age; (C) family; and (D) "other reasons." Subdivision (D), however, isn't the catchall its branding suggests, because it limits the other reasons that count to only those the BOP has said (on a case-by-case basis) count: "As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." To counsel's knowledge (and the government is free to demonstrate otherwise, of course), the BOP has rarely, if ever, made the other-reasons determination that subdivision (D) envisions and, thus, the provision isn't much of a catchall in practice, as it has caught few, if any, cases

19

that don't already fall within the application note's other provisions.[4]

Subdivision (C) ranks family circumstances as extraordinary and compelling when the defendant is the only one left to care for any children, spouse, or "registered partner" he may have. Subdivision (B)'s age criterion deems age extraordinary and compelling only if the defendant is at least 65, is ailing due to age, and has served the less of at least 10 years or 75% of his or her imprisonment term.

Subdivision (A) of Application Note 1, the focus of most pandemic-related compassionate release proceedings, counts a defendant's physical and medical condition as extraordinary and compelling only in four, narrowly defined, situations. Terminal illness counts. USSG §1B1.13, comment. (n. 1(A)(i)). While the other three—a serious physical or medical condition (n.

---

[4]  The BOP's use of compassionate release for *any* of the reasons allowed by statute or guideline has been grudging to say the least. Two respected watchdog groups report that the BOP's annual *average*, over the course of some two decades, was less than two dozen motions. Human Rights Watch & Families Against Mandatory Minimums, *The Answer Is No: Too Little Compassionate Release in US Federal Prisons*, at 34 (Nov. 2012), available at www.hrw.org/sites/default/files/reports/us1112ForUploadSm.pdf (last visited Sept. 30, 2020) (quoting the Government Accountability Office's conclusion that the BOP filed compassionate release motions "infrequently" and reporting that the BOP made "only 492 motions for compassionate release" for the 21-year period between 1992 and 2012, which amounts to "an annual average of about two dozen").

1(A)(ii)(I)), a serious functional or cognitive impairment (n. 1(A)(ii)(II)), or

deterioration of physical or mental health because of aging (n. 1(A)(ii)(III))—

count only if they "substantially diminish[] the ability of the defendant to

provide self-care within the environment of a correctional facility," and more,

only if the defendant isn't "expected to recover" from the condition,

impairment, or deterioration invoked as a reason for compassionate release.

USSG §1B1.13, comment. (n. 1(A)(ii)).

The FSA went into effect on December 21, 2018. A provision of the FSA

amended §3582(c)(1)(A) to allow for defendants to move for compassionate

release, instead of having to rely on the BOP doing so on their behalf. To

subsection (c)(1)(A), the FSA added what's italicized:

> (A)   the court, upon motion of the Director of the Bureau of
> Prisons, *or upon motion of the defendant after the defendant has
> fully exhausted all administrative rights to appeal a failure of the
> Bureau of Prisons to bring a motion on the defendant's behalf or
> the lapse of 30 days from the receipt of such a request by the
> warden of the defendant's facility, which is earlier,* may reduce the
> term of imprisonment (and may impose a term of probation or
> supervised release with or without conditions that does not exceed
> the unserved portion of the original term of imprisonment), after
> considering the factors set forth in section 3553(a) to the extent
> that they are applicable, if it finds [ECR, or A&S, and guidelines
> consistency].

18 U.S.C. §3582(c)(1)(A) (2018). The FSA did not change the wording of the

rest of the statute's provisions. The post-FSA version of §3582(c)(1)(A),

accordingly, still directs the court to consider §3553(a)'s applicable factors (if any), still requires the court to find the ECR or the A&S criterion are met, still ties a BOP lack-of-danger determination only to the A&S criterion, and still mandates consistency with any "applicable policy statements" the Sentencing Commission may promulgate. USSG §3582(c)(1)(A) (2018). The Commission, however, hasn't amended §1B1.13 since the enactment of the FSA. Nor has the Commission promulgated any additional policy statement applicable to §3582(c)(1)(A) proceedings commenced on a defendant's motion, rather than on the BOP's motion.

      a.     The cleanest way to deal with *Stinson* deference is startlingly simple. When a §3582(c)(1)(A) proceeding arises upon a defendant's motion, rather than upon a BOP motion, there is no applicable policy statement to which to defer under *Stinson* or with which to maintain consistency under §3582(c)(1)(A). By its own terms, the current version of §1B1.13 limits its applicability to cases in which *the BOP* has filed the §3582(c)(1)(A) motion. Section 1B1.13 simply isn't an "applicable policy statement" when the defendant moves for compassionate release.

     Section 1B1.13's first words are: "Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. §3582(c)(1)(A), the court may …." If that opening salvo doesn't suffice to limit §1B1.13's applicability to only cases

22

arising upon a BOP motion, Application Note 4 emphases the point: "A reduction under this policy statement may be granted only upon motion by the Director of the Bureau of Prisons pursuant to 18 U.S.C. §3582(c)(1)(A)." So does Application Note 5, albeit tacitly: "Any reduction made pursuant to a motion by the Director of the Bureau of Prisons for the reasons set forth in subdivisions (1) and (2) is consistent with this policy statement." Those three provisions render §1B1.13 the "applicable policy statement" only in cases arising upon the BOP's §3582(c)(1)(A) motion. Section 1B1.13, accordingly, is not a policy statement that applies, under the post-FSA version of §3582(c)(1)(A), when the court's consideration of compassionate release arises upon a defendant's motion rather than upon a motion brought by the BOP. From its opening words to its final application note, section 1B1.13 and its commentary are applicable only when the motion under review has been filed by the BOP.

The Commission hasn't promulgated a policy statement applicable to *a defendant's* motion for §3582(c)(1)(A) compassionate release. When a §3582(c)(1)(A) proceeding commences upon a defendant's motion, rather than "upon motion by the Director of the Bureau of Prisons," there is thus no applicable policy statement and nothing to defer to under *Stinson*. The only thing governing the court's review, at least until the Commission deigns to

23

enact a policy statement that's applicable "upon motion of the defendant under 18 U.S.C. §3582(c)(1)(A)," is the statute itself. And all the statute requires is that there be "extraordinary and compelling reasons" that warrant reducing the defendant's sentence (or, alternatively, that the defendant meet the A&S criterion, but that's not in play here) and doing so accords with §3553(a)'s general sentencing factors, to the extent any apply. 18 U.S.C. §3582(c)(1)(A). This Court, accordingly, should join the Second Circuit in so holding. *United States v. Zullo*,[5] ___ F.3d ___, 2020 WL 5739712, at *6 (CA2 2020) ("we read the Guideline as surviving, but now applying only to those motions that the BOP has made").

Because there is no applicable policy statement to which to defer when the defendant moves for §3582(c)(1)(A) relief, what counts as "extraordinary and compelling" is presently an exercise of judicial discretion, fettered only by §3582(c)(1)(A)'s directive to consider §3553(a)'s sentencing factors to the extent they have something to say.

---

[5] Westlaw's defaults presently have the service reporting this case under the misnomer *United States v. Brooker*. Brooker and numerous others were defendants in the case, but Zullo was the only defendant-appellant. The Second Circuit's web site lists the case under the name used here, as *United States v. Zullo* (docketed as CA2 No. 19-3218-cr), see www.ca2.uscourts.gov (Decisions tab, "Zullo" basic search) (last visited Sept. 30, 2020).

b.      Deeming §1B1.13 an applicable policy statement when relief is sought upon a defendant's motion rather than upon a BOP motion requires taking a piecemeal approach to *Stinson*. In order to invoke *Stinson* deference to, say, Application Note 1's physical and medical condition criterion, you have to first turn off *Stinson* deference to the guideline's and its commentary's various provisions allowing for relief only upon a BOP motion. Section 1B1.13's opening clause must be judicially elided. The *whole* of Application Note 4 must be judicially elided. And "pursuant to a motion by the Director of Bureau of Prisons" must be elided from Application Note 5. Elision is not deference.

Nor can the elision of these provisions of the guideline and its commentary be characterized as redlining the bits that are inconsistent with, or a plainly erroneous reading of, the post-FSA version of §3582(c)(1)(A). The post-FSA statute still allows the BOP to bring a compassionate release motion. There's nothing wrong with a guideline policy statement that implements only part of a statute. And, too, section 3582(c)(1)(A)'s directive to remain faithful to "applicable policy statements" (plural), rather than 'an applicable policy statement' (singular), contemplates just such a hodgepodge approach. Section 1B1.13's opening clause, accordingly, isn't inconsistent with the statute, nor does it plainly misinterpret the statute. Invoking *Stinson* to *elide* clauses of the

25

guideline and its commentary—that otherwise would limit them to cases brought upon a BOP motion—morphs *Stinson* deference into something that, in lieu of commanding deference to what the guideline and its commentary say, condones defying what they say.

        c.      But even if we set aside the difference between deference and defiance, at least one provision of §1B1.13 *is* inconsistent with and a plainly erroneous construction of §3582(c)(1)(A). The guideline makes lack of dangerousness a free-standing requirement that the court must find. USSG §1B1.13(2). The statute does not do that. Instead, the statute attaches lack of dangerousness only to the statute's A&S criterion, not its ECR criterion. 18 U.S.C. §3582(c)(1)(A). The statute also makes the BOP the decision-maker on dangerousness (under the A&S criterion), not the court.

Congress could readily have done what the guideline does. That Congress attached a lack-of-dangerousness requirement onto the A&S criterion and, too, specified a decision-maker on dangerousness demonstrate Congress knew how. But Congress chose not to impose a separate lack-of-danger requirement in ECR cases, much less did it require the court to make such a finding (and even less, did it place the burden on the defendant, as courts—the district court here among them—seem to have done in their rush to conform the guideline to the post-FSA version of §3582(c)(1)(A)). By making a choice that

26

directly conflicts with the choice Congress clearly made, the guideline and its commentary's dangerousness provisions are inconsistent with, and plainly erroneous constructions of, the post-FSA version of section 3582(c)(1)(A).

Section §1B1.13(2), accordingly, is not entitled to *Stinson* deference and should not be invoked to place a burden on the defendant to prove that he is not a danger to the safety of others or the community in ECR cases.

      d.      Another provision that *Stinson* deference legitimately touches—assuming still that deference allows for defiance—is Application Note 1's "other reasons" criterion. The note's opening clause restricts the "other reasons" that count to those the BOP has said count in the defendant's case. USSG §1B1.13, comment. (n. 1(D)). That clause is inconsistent with, and a plainly erroneous reading of, the post-FSA version of §3582(c)(1)(A), because it assigns assessment of what counts as extraordinary and compelling to the BOP, whereas the statute assigns it to courts. The opening clause of Application Note 1(D) is also inconsistent with the post-FSA statute for another reason.

The FSA adopted an exhaustion requirement when a defendant moves for compassionate release, which can be met in one of two ways. The first way calls on the defendant to have "exhausted all administrative remedies to appeal a failure of the [BOP] to bring a motion on the defendant's behalf." 18 U.S.C. §3582(c)(1)(A) (2018). The other way calls on the defendant to do nothing

27

more than wait for 30 days to "lapse … from the receipt of" her warden's

receipt of her administrative compassionate release request. 18 U.S.C.

§3582(c)(1)(A) (2018). The statute thus allows a court to grant a defendant

compassionate release even if the BOP has stood mute in response to a

defendant's release request. Application Note 1(D)'s imposition of BOP

oversight on what counts as other reasons to grant relief is, thus, inconsistent

with the statute's contemplation that relief can be judicially granted, on a

defendant's motion, when the BOP has said nothing as to that defendant's case.

Either way, there shouldn't be any *Stinson* deference to the opening

clause of Application Note 1(D) and, thus, the determination of what other

reasons count should be a judicial, rather than remain an administrative,

determination. Construing Application Note 1(D) to allow for a judge to decide

what "other reasons" are extraordinary and compelling is, however, simply a

convoluted way to get to much the same place we get to by simply recognizing

§1B1.13 isn't an applicable policy statement, when the defendant moves for

compassionate release, in the first place.

     e.     There is an intra-district split on whether, and the extent to

which, *Stinson* deference applies to §1B1.13 and its commentary after the

FSA's amendments to §3582(c)(1)(A). In this matter, the district court deferred

under *Stinson* to Application Note 1's construction of what counts as

extraordinary and compelling under the statute and guideline. ER-3–ER-6;
*Rodrigues*, 2020 WL 5351029, at \*3; *Kealoha*, 2020 WL 3735773, at \*5–\*6.
The district court's rationale, however, does not delve into the language of the
statute, the guideline, and its application notes. Instead, the court's rationale
turns solely on the notion that "the FSA only amended the *procedural
requirements* under Section 3582(c)(1)" and, thus, such a non-substantive
change in the statute does not turn off *Stinson* deference to the policy statement
and commentary promulgated under the pre-amended version of the statute.
*Kealoha*, 2020 WL 3735773, at \*5–\*6. The district court, that is, thinks that
procedural inconsistencies do not turn off *Stinson* deference and only a
substantive inconsistency between a guideline and a statute will. Drawing such
a procedural-substantive line is not something Lyman's counsel has seen
*Stinson* cases do, nor did the district court cite any that have.

Two other judges in the District of Hawaii have ruled to the contrary.
Senior District Court Judge Mollway thinks that, by substituting her own
discretion for the discretion the policy statement and its commentary vest in the
BOP, she is conducting post-FSA §3582(c)(1)(A) review consistently with the
policy statement and its commentary. *Cisneros*, 2020 WL 3065103, at \*2
("[r]ecognizing that courts now possess wide discretion in compassionate
release cases is consistent with the policy statement that accorded the Director

29

of the Bureau of Prisons the same discretion before the passage of the First Step Act"). Chief District Court Judge Seabright has similarly ruled that courts have discretion to determine what "other" reasons may suffice to meet the statute's and guideline's ECR criterion. *Hernandez*, 2020 WL 3453839, at * 4. And while his rationale includes some broad language that suggests some agreement with the notion that the guideline as a whole "conflicts with the amended statute" to the extent the guideline applies to only BOP-filed motions, *id.* at *3, he nonetheless reviews defendant-filed §3582(c)(1)(A) motions underneath the guideline's provisions and commentary, albeit replacing, as Judge Mollway does, BOP oversight with judicial discretion, *id.* at *5–*6.

The split on the issue of whether and the extent to which *Stinson* deference attaches to §1B1.13 under the post-FSA §3582(c)(1)(A) is not limited to this district. District courts within this circuit are split on the issue, as they are nationally. See, e.g., *United States v. Schweder*, 2020 WL 5257598, at *3 (E.D. Cal.) (Sept. 3, 2020) (slip copy) (describing split and collecting cases). In this circuit, courts have said the majority favors applying the guideline and its commentary but in accord with judicial discretion rather than affording any discretion to the BOP. *Id.* But, as explained above, that does not seem to really be what *Stinson* contemplates courts doing. The correct path, rather, is to say that §1B1.13 is an applicable policy statement—to which courts must defer

under §3582(c)(1)(A) and *Stinson*—when the BOP has filed a §3582(c)(1)(A) motion, but not when review under §3582(c)(1)(A) arises upon a defendant's motion. *Zullo*, 2020 WL 5739712, at *6. When §3582(c)(1)(A) relief is requested upon motion of a defendant, there is no applicable policy statement.

       f.      This Court, accordingly, should remand this matter for a re-do because the district court did not correctly understand the scope of its discretion under §3582(c)(1)(A) to grant Lyman's motion. *United States v. Khoury*, 62 F.3d 1138, 1141 (CA9 1995) (if a district court mistakenly believed it lacked discretion it legally had, remedy is "a remand to exercise its discretion" (citing *United States v. Morales*, 972 F.2d 1007, 1011 (CA9 1992))); *Zullo*, 2020 WL 5739712, at *9 (remanding for the district court "to exercise the discretion that the First Step Act gives to it").

### 3.      Physical and medical condition

      The district court's analysis of Lyman's physical and medical condition also gives rise to reversible error, be it circumscribed by Application Note 1(A)'s parameters or not. The entirety (shorn of record citations) of the district court's reasoning on why Lyman's physical and medical condition wasn't extraordinary or compelling consists of this:

> [A]s Lyman's medical records reflect, he contracted the coronavirus in May 2020. However, as the same records further reflect, Lyman was screened for coronavirus symptoms for almost

two weeks after first being diagnosed and, in every one of those screenings, he denied any symptoms, such as a cough, as a result of the virus. Further, the medical record also state that Lyman's case of coronavirus was 'resolved' approximately two weeks after his diagnosis. In this light, although Lyman asserts that he has certain medical conditions that are 'risk factors' for the coronavirus, it appears that the virus has not 'substantially diminished' his ability to provide self-care in prison. See U.S.S.G. §1B1.13, app. note (1)(A)(ii). In addition, the facility in which Lyman is incarcerated—Lompoc FCI—while once having a high number of confirmed coronavirus cases, now registers no such cases amongst the inmate population. See https://www.bop.gov/coronavirus (last visited July 24, 2020).[fn]

ER-4–ER-5 (brackets and record citations omitted; footnote asserting Application Note 1(D)'s other reasons criterion is of "no use" to Lyman omitted). There are a number of problems with the district court's rationale for determining that Lyman's physical and medical condition, which placed him at higher risk of hospitalization or death from Covid-19, did not provide an extraordinary and compelling reason to grant him compassionate release.

      a.     For one thing, the district court appears to have simply misunderstood what Application Note 1(A)'s self-care requirement calls for when dropped into circumstances that include a world-wide pandemic. The ability to provide self-care amidst the Covid-19 pandemic includes being able to

take precautions—at a minimum, those the CDC has established[6]—against infection. It does not mean simply being able to do mundane daily activities, like eating and bathing. There can be no dispute that Lyman does not have the ability to protect himself from infection at Lompoc FCI. The fact that he became infected once attests both that he is not able to guard against infection and that the BOP is unable to prevent him from becoming infected. Lyman's physical and medical condition (most notably, his severe obesity and chronic kidney disease[7]) further diminish his ability to protect himself from infection, hospitalization, and death from Covid-19 infection.

---

[6]     Among CDC recommendations that Lyman has no ability to exert self-control over while in prison, but could if compassionately released, are avoiding those who are sick, social distancing, frequent disinfection of his environment, and wearing a clean mask. *How to Protect Yourself & Others*, CDC (Sept. 11, 2020), www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Sept. 24, 2020).

[7]     The CDC recognizes that obesity (a BMI of at least 30) and chronic kidney disease place Lyman at increased risk of hospitalization, if not death, from Covid-19, and that his asthma might further contribute to placing him at increased risk. *People with Certain Medical Conditions*, CDC (Sept. 11, 2020), www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Sept. 24, 2020). The CDC does not presently deem high cholesterol a risk factor, but medical research suggests that high cholesterol may well be the reason other things increase the risk of hospitalization and death from Covid-19. Liji Thomas, MD, *Does cholesterol play a role in Covid-19?*, News Medical Life Sciences (May 12, 2020), www.news-medical.net/news/20200512/Does-cholesterol-play-a-role-in-COVID-19.aspx (last visited Sept. 30, 2020) (reporting a "new study" indicates

The government may counter that shifting the baseline for self-care to include the ability to guard against infection makes every inmate's case extraordinary and compelling and thus necessitates releasing them all. That is not so for at least two reasons. One, because a defendant's physical and medical condition has a role to play in making a defendant's circumstances extraordinary and compelling. Courts readily agree that the common risk Covid-19 presents to all inmates does not alone suffice to constitute something extraordinary and compelling. But when a defendant's physical and medical condition dramatically increase the risk that the defendant will become hospitalized or die from the virus, the circumstances do become extraordinary and compelling. Two, because the statute and guideline both require case-by-case consideration of §3553(a)'s sentencing factors, which stand as a bulwark against any over-release of inmates.

---

that "the striking increased mortality in Covid-19 patients who are either old or also have high blood pressure, diabetes, [or] cardiovascular disease is due to high tissue cholesterol levels"). The CDC does recognize, moreover, that Lyman's age (41) makes him three times as likely to be hospitalized from infection as someone who is 18–29 years old, and ten times more likely to die from infection. *Covid-19 Hospitalization and Death by Age*, CDC (Aug. 18, 2020), www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html (last visited Sept. 24, 2020).

34

b.      The district court took the wrong thing away from Lyman's recovery from an asymptomatic infection of Covid-19. At the time the district court ruled on Lyman's motion, the immunity response to Covid-19 was unknown. Presently, the CDC acknowledges that "science does not imply a person is immune to reinfection" from Covid-19. *Updated Isolation Guidance does not Imply Immunity to Covid-19*, CDC (Aug. 14, 2020), www.cdc.gov/media/releases/2020/s0814-updated-isolation-guidance.html (last visited Sept. 24, 2020). The CDC also maintains that the immunity response to infection still remains unclear. *Clinical Questions about Covid-19: Questions and Answers*: *Transmission: Can people who recover from Covid-19 be re-infected with SARS-CoV-2*, CDC (Aug. 4, 2020), www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html#Transmission (last visited Sept. 24, 2020).

But verified accounts of reinfection, evincing not only that reinfection occurs but can take a drastically different course than prior infection, are beginning to be compiled. William A. Haseltine, *What Covid-19 Reinfection Means for Vaccines*, Scientific American (Sept. 23, 2020) (asserting "[w]e now know repeat infections are possible"), www.scientificamerican.com/article/what-covid-19-reinfection-means-for-vaccines/ (last visited Sept. 24, 2020); Heidi Ledford, *Coronavirus reinfections: three questions scientists are asking*,

35

Nature (Sept. 4, 2020), www.nature.com/articles/d41586-020-02506-y (last visited Sept. 24, 2020); Nancy Lapid, *Covid-19 reinfection detected in U.S. patient; saliva tests endorsed*, Reuters (Aug. 28, 2020), www.reuters.com/article/us-health-coronavirus-science-idUSKBN25O2UP?taid=5f497d444b992e000118c1b1&utm_campaign=trueAnthem:+Trending+Content&utm_medium=trueAnthem&utm_source=twitter (last visited Sept. 24, 2020); WebMD, *Coronavirus Immunity and Reinfection* (reporting loss of antibodies within a few months, more than 160 reinfections in South Korea, and a 5%–10% reinfection rate in China), www.webmd.com/lung/coronavirus-immunity-reinfection#1 (last visited Sept. 24, 2020).

More compellingly, the BOP's own records belie the district court's blithe dismissal of the idea that reinfection can occur with dire results. Adrian Solarzano, for one, died from reinfection after the BOP deemed him recovered from a prior infection. *United States v. Yellin*, 2020 WL 3488738, at *3 (S.D. Cal.) (June 26, 2020) (slip copy); *Inmate Death at the FCI Terminal Island*, BOP Press Release (May 27, 2020), www.bop.gov/resources/news/pdfs/20200527_press_release_trm.pdf (last visited Sept. 30, 2020). The BOP also deemed Marie Neba recovered before she died. *Inmate Death at FMC Carswell*, BOP Press Release (Aug. 26, 2020), www.bop.gov/resources/news/pdfs/

20200826_press_release_crw.pdf (last visited Sept. 30, 2020). The BOP's press releases as to others are less candid and don't come right out and say that the inmate's death followed on the heels of the BOP deeming the inmate "recovered" from Covid-19 infection, but it is clear enough that is what happened in at least four other cases.

Barry Johnson died on September 23, 2020, after asymptomatic infection, release from a BOP 11-day quarantine, and being twice cleared by BOP medical staff and once by a local hospital. *Inmate Death at FCI Edgefield*, BOP Press Release (Sept. 25, 2020), www.bop.gov/resources/news/ pdfs/220200926_press_release_johnson.pdf (last visited Sept. 30, 2020). Thomas Krebs, who tested negative after twice testing positive, nonetheless died too. *Inmate Death at FMC Lexington*, BOP Press Release (Sept. 25. 2020), www.bop.gov/resources/news/pdfs/20200925_press_release_lex.pdf (last visited Sept. 30, 2020). Ricky Lynn Miller tested positive on June 1st, negative on July 6th, was evaluated by BOP medical staff on September 9th (because he had trouble breathing and one or both of his legs were swollen) and sent to a local hospital for treatment, where he again tested positive on September 16th, and then died on September 17th. *Inmate Death at FCI Butner (Low)*, BOP Press Release (Sept. 17, 2020), www.bop.gov/resources/news/pdfs/20200917

_press_release_bux.pdf (last visited Sept. 30, 2020). And Gerald Porter died after negative tests indicated he had recovered from infection. *Inmate Death at FMC Lexington*, BOP Press Release (July 31, 2020), www.bop.gov/resources/ news/pdfs/20200731_press_release_lex.pdf (last visited Sept. 30, 2020). Six dead "recovered" inmates counsel strongly against denigrating, or worse simply ignoring, the increased risk Lyman's physical and medical condition expose him to becoming a seventh.

The takeaway from Lyman's prior reinfection is not that he is immune from the virus or that his risk factors aren't risk factors at all. The takeaway is that the BOP is not able to protect him from infection and that he is not able to protect himself from infection. Indeed, the BOP recently admitted as much in a status report filed in the class-action against Lompoc FCI's warden, agreeing "that prior infection with Covid-19 is not a basis to deny a class-member home confinement." *Torres v. Milusnic*, DC No. 2:20-cv-04450-CBM-PVC (C.D. Cal.), ECF 84 (Joint Status Report) (Aug. 28, 2020). Lyman's prior infection and recovery thus do little, if anything, to offset the increased risk of infection, hospitalization, and death that his physical and medical condition exposes him to during the Covid-19 pandemic, and which neither he, nor the BOP, can presently protect him against.

c. The district court similarly took the wrong thing away from the BOP's self-reported statistics about Lompoc FCI. That the BOP self-reports a lack of infections on any given day does not say anything more than that there are, according to the BOP, no cases of infection on that day. Such a frozen statistic certainly isn't any guarantee against Covid-19's return, nor any testament to the efficacy of the BOP's efforts to guard inmates from infection, hospitalization, and death from Covid-19.

That the BOP's policies and procedures have not cleansed its facilities of the virus and haven't prevented inmates from becoming infected, reinfected, and dying from the virus is the more important point. The BOP's self-reporting, moreover, does not come with any indicia of reliability. Indeed, since mid-July, for example, the BOP has reported *no* pending Covid-19 tests for Lompoc FCI, over the course of the past two months. See, e.g., *United States v. Kapeli*, DC No. 1:16-cr-00172-JMS (D. Haw.), ECF 88-1 (chart of BOP's daily testing data for Lompoc FCI from July 15, 2020, to Sept. 16, 2020) (Sept. 18, 2020). That generates only one inference: the BOP hasn't tested any inmates at Lompoc FCI for over two months (as of the writing of this brief in late September 2020). Such a lack of testing, accordingly, skews the BOP's daily self-reporting of the number of inmates testing positive at Lompoc FCI.

Nor should any of that come as a surprise. Mid-July is when a district court granted a preliminary injunction in the *Torres* class-action suit, litigation in which remains contentious. See, e.g., *Torres*, supra, ECF 45 (July 14, 2020) (order granting preliminary injunction); ECF 99 (Sept. 18, 2020) (order denying the BOP's motion to dismiss, ruling inmates pled sufficient facts to survive the BOP's motion to dismiss their claims that "Lompoc inmates are at substantial risk of exposure to Covid-19, which is inconsistent with contemporary standards of human decency," and that the BOP has "ignored, and therefore ha[s] been deliberately indifferent, to the known risk of inmate's exposure to infection, severe illness, and death due to Covid-19 based on the conditions at Lompoc"). The BOP's self-reported statistics for Lompoc FCI since mid-July 2020, accordingly, are not trustworthy in light of its continuing efforts to evade being held accountable in the pending *Torres* class-action case.

Two Lompoc FCI inmates, Daniel Lee Vadnais and Mohamed Yusuf, have died from Covid-19. *Inmate Death at Lompoc FCI*, BOP Press Release (June 1, 2020), www.bop.gov/resources/news/pdfs/20200601_press_release _lom.pdf (last visited Sept. 30, 2020); *Inmate Death at Lompoc FCI*, BOP Press Release (May 29, 2020), www.bop.gov/resources/news/pdfs/20200529_press _release_lox.pdf (last visited Sept. 30, 2020). And at one point, nearly *every* Lompoc FCI inmate was infected with Covid-19. Dave Minsky, *Nearly all*

40

*inmates at Lompoc FCI tested positive for coronavirus, most asymptomatic*, Lompoc Record (June 5, 2020), www.lompocrecord.com/news/local/crime-and-courts/nearly-all-inmates-at-lompoc-fci-tested-positive-for-coronavirus-most-asymptomatic/article_f3fb06d7-f231-52b3-8f89-f21f11b73974.html (last visited Sept. 24, 2020). The takeaway from all of this is not that inmates in Lompoc FCI are safe from infection, hospitalization, and death. The takeaway is that the BOP is manipulating Lompoc FCI's statistics in a ploy to avoid liability in a class-action lawsuit. And, too, that the BOP is neither adequately nor humanely guarding inmates against infection, hospitalization, and death from Covid-19.

        d.     In accord with the forgoing, the district court's analysis of Lyman's physical and medical condition is unreasonable and lacks support. For either or both reasons, the district court's ruling on this point is an abuse of discretion and reversible error. *Lewis v. Liberty Mutual Insurance Company*, 953 F.3d 1160, 1163–1164 (CA9 2020) (striking "an unreasonable balance of relevant factors" is an abuse of discretion).

### 4.    Relevance of the post-FSA mandatory minimum

The district court's determination that the FSA's lowering of §841's mandatory minimums was irrelevant under §3582(c)(1)(A) is also wrong.

Section 3582(c)(1)(A) directs courts to consider, to the extent applicable, the factors set forth in §3553(a). Those factors, among other things, direct courts to consider the need for the sentence to reflect the seriousness of the offense and just punishment for it, as well as the kinds of sentences available and the need to avoid sentencing disparity among defendants with similar criminal records found guilty of similar conduct. 18 U.S.C. §§3553(a)(2), (3), and (6). That the FSA lowered the mandatory minimum for defendants with similar criminal records guilty of similar offense conduct is certainly relevant to these factors.

The FSA's lowering of the mandatory minimum degrades the seriousness of Lyman's offense and alters the assessment of what constitutes just punishment for it. The FSA's lowering of the mandatory minimum also changes assessment of the kinds of sentences Congress has enacted for violations of §841(a). And assessment of sentencing disparity is altered by congressional recognition that those punished for Lyman's offense conduct, who have similar criminal histories, should only face a 15-year mandatory minimum, rather than the 20-year mandatory minimum Lyman is serving.

Other courts (including at least one judge from the District of Hawaii) agree that the FSA's lowering of §841's mandatory minimums is at least *relevant* to an assessment of §3553(a)'s factors in a §3582(c)(1)(A) proceeding.

42

See, e.g., *Cisneros*, 2020 WL 3065103, at *3 (D. Haw.); see also, e.g., *United States v. Cantu-Rivera*, 2019 WL 2578272, at *2 (S.D. Tex.) (June 24, 2019) (unpublished); *United States v. Mondaca*, 2020 WL 1029024, at *6 (S.D. Cal.) (Mar. 3, 2020) (slip copy); *United States v. Chan*, 2020 WL 1527895, at *6 (N.D. Cal.) (Mar. 31, 2020) (slip copy); *United States v. Bryant*, 2020 WL 2085471, at *3 (D. Md.) (Apr. 30, 2020) (slip copy); *United States v. Quinn*, ___ F.Supp.3d ___, 2020 WL 3275736, at *4 (N.D. Cal. 2020); *United States v. Quintero*, 2020 WL 3639936, at *3 (N.D. Cal.) (July 6, 2020) (slip copy).

On this point, as on all the others briefed here, the district court misunderstood the scope of its discretion, this time by ruling that the court could not consider the FSA's reduction of the mandatory minimum applicable to Lyman's offense and criminal history. And once again, *Zullo* gets it right:

> Nor can we say, as a matter of law, that a court would abuse its discretion by granting someone compassionate release on this record. It bears remembering that compassionate release is a misnomer. [Section] 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence, or end the term of imprisonment but impose a significant term of probation or supervised release in its place. *Id.* Beyond this, a district court's discretion in this area—as in all sentencing matters—is broad. See *United States v. Cavera*, 550 F.3d 180, 188 (CA2 2008) (en banc) (noting a district court's "very wide latitude" in sentencing). The only statutory limit on what a court may consider to be extraordinary and compelling[] is that "[r]ehabilitation ... *alone* shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t) (emphasis added).

> In the instant case, Zullo does not rely *solely* on his (apparently extensive) rehabilitation. Zullo's age at the time of his crime and the sentencing court's statements about the injustice of his lengthy sentence might perhaps weigh in favor of a sentence reduction. Indeed, Congress seemingly contemplated that courts might consider such circumstances when it passed the original compassionate release statute in 1984. See S. Rep. No. 98-225, at 55-56 (1984) (noting that reduction may be appropriate when "other extraordinary and compelling circumstances justify a reduction of an *unusually long* sentence" (emphasis added)); see also *United States v. Maumau*, 2020 WL 806121, at *6-*7 (D. Utah) (Feb. 18, 2020) [(slip copy)] (further discussing this history and collecting cases where district courts have reduced sentences in part because they were overly long).

*Zullo*, 2020 WL 5739712, at *8. The district court had, but believed it did not

have, the discretion to determine that Lyman's sentence was simply too long in

light of the FSA's reduction of the mandatory minimum applicable to his

offense conduct and criminal history. The district court, moreover, had the

discretion to take the FSA into account to reduce Lyman's sentence to the FSA-

approved 15-year minimum or, alternatively, to convert his unserved

imprisonment (be it calculated by reference to the FSA 15-year minimum or the

over-long 20-year minimum originally imposed) to supervised release upon

reducing his imprisonment term to time served.

## Conclusion

This Court should vacate the district court's order denying Lyman's motion for reduction of his sentence under 18 U.S.C. §3582(c)(1)(A). This Court should instruct the district court on the proper extent of its discretion to grant a defendant's motion for a compassionate release sentencing reduction under §3582(c)(1)(A), not only by holding USSG §1B1.13 does not apply to a defendant's motion, but by informing the district court that the FSA's mandatory-minimum reduction is relevant. And this Court should accordingly remand this matter for further proceedings consistent with §3582(c)(1)(A) and §3553(a) and the full scope of judicial discretion those statutes allow.

This Court should also consider remanding this matter to a different district court judge. Judge Watson's uniform failure to grant any defendant compassionate release during the pandemic is troubling enough. But he has also abdicated his statutory discretion to the guideline and the BOP far too readily and to such an extent that he has now issued an order (see footnote 2) that plainly and inexplicably defies what §3582(c)(1)(A) unambiguously requires. *United States v. Paul*, 561 F.3d 970, 975 (CA9 2009) (reaffirming that remand to a different judge is appropriate when the judge would have substantial difficulty disregarding his previously expressed views, when necessary to

preserve an appearance of justice, and when doing so doesn't waste judicial resources).

DATED: Honolulu, Hawaii, October 7, 2020.

 /s/ Max J. Mizono
MAX J. MIZONO
Assistant Federal Defender
Counsel for Jacob Lyman

**Statement of Related Cases**

A complete census of pandemic-related appeals in §3582(c)(1)(A) compassionate release cases is beyond counsel's ken. Those pending in this Court filed by the Office of the Federal Public Defender for the District of Hawaii as of the date this brief was written are:

- *United States v. Rivera*, CA9 No. 20-10214;

- *United States v. Aruda*, CA9 No. 20-10245;

- *United States v. Cross*, CA9 No. 20-10259;

- *United States v. Tufele*, CA9 No. 20-10282;

- *United States v. Mauga*, CA9 No. 20-10294; and

- *United States v. Ogata*, CA9 No. 20-10312.

DATED: Honolulu, Hawaii, October 7, 2020.

 /s/ Max J. Mizono
MAX J. MIZONO
Assistant Federal Defender
Counsel for Jacob Lyman

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 20-10242

I am the attorney or self-represented party.

This brief contains 10,318 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because:
  [ ] it is a joint brief submitted by separately represented parties;
  [ ] a party or parties are filing a single brief in response to multiple briefs; or
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Max J. Mizono          **Date** October 7, 2020